MEMORANDUM OPINION AND ORDER
PAYNE, District Judge.
Mays & Valentine has moved for leave to withdraw as counsel in this action to defendant, BMI Apartments Associates (“BMI”). For the reasons set forth below, the motion to withdraw is granted.
STATEMENT OF FACTS
BMI was organized to acquire an apartment complex in 1985 in Portsmouth, Virginia. The complex is the contaminated site at issue in this action. The purchase was highly leveraged, and the BMI partnership was in financial difficulty when the environmental problem which is the focus of this litigation was discovered in the fall of 1992 by a prospective purchaser.[1] In December 1992, the law firm that was representing BMI in the pending sale identified a conflict of interest because of its representation of Commonwealth Gas Services, Inc., a previous owner of the site which BMI considered to be responsible for the .environmental contamination. It thus became necessary for BMI to retain the services of other counsel.
A. BMI’s Retention of Mays & Valentine
BMI, acting through Howard E. Gordon, a seasoned lawyer specializing in real estate practice and a partner in BMI, requested Mays & Valentine to represent the partnership on the environmental dispute it then anticipated with Commonwealth. Mays & Valentine assigned this representation to James E. Ryan, Jr., a partner who specializes in environmental law. At about the same time, some of BMI’s creditors issued a notice of default on certain of the partnership’s" debts and early discussions with Mays & Valentine concerned the tax implications of the proposals to restructure these debts. Thus, at the time it undertook representation of BMI, Mays & Valentine was aware generally of the partnership’s financial condition and of the fact that some of its individual partners were contemplating, or were in, bankruptcy.
Discussions concerning the environmental situation at the site and the hiring of Mays & Valentine involved several BMI partners, all of whom are lawyers or were represented by lawyers. Thereafter, Ryan prepared an engagement letter providing the terms upon which Mays & Valentine' was prepared to undertake representation of BMI. On December 23, 1992, the engagement letter was sent to two BMI partners: Gordon, a Fellow of the American College of Real Estate Lawyers, and H. David Embree, a practicing attorney for 19 years who also specialized in real estate practice. Gordon and Embree are partners in Hofheimer, Nusbaum, McPhaul and Samuels, a highly respected Norfolk law firm.
On January 6, 1993, Ryan discussed with Gordon and Embree the liability scheme established by the Comprehensive Environmental Response, Compensation and Liability Act (“CERCLA”)[2] and certain other subjects, all of which are privileged communications, the particularization of which is not necessary to resolution of the motion to withdraw. Later that day, there was a conference telephone call between Ryan and several BMI partners, including Gordon, Embree and the lawyers for other BMI partners. There is some dispute as to what was said during this conference, but it is not disputed that Ryan said that, under certain circumstances, it was possible to recover response costs under CERCLA. Some of those present apparently construed this to include attorneys’ fees. Some participants on behalf of *778 BMI went so far as to say that Ryan represented that BMI could recover attorneys fees from Commonwealth Gas as response costs and one participant stated that he understood Ryan to have warranted that all attorneys fees could be recovered.
On January 12, 1993, Gordon executed the engagement letter on behalf of BMI and its partners. The engagement letter provided in part:
Mays & Valentine will be pleased to assist you in the representation of BMI Apartments Associates with respect to any problems of contamination of the property....
... We will base our legal fees on the amount of time expended by the attorneys who work on this matter.... I anticipate that the work on this matter will be performed primarily by me and Neil Kessler at the outset, and by Brad Davenport if litigation is involved. Our rate is presently $195.00 per hour. We will use paralegals and attorneys with lower rates whenever it makes sense, but expect that these three experienced attorneys will do most of the needed work.
Our practice is to bill monthly for time expended and disbursements made by us in the previous month.... Bills are due and payable when rendered. Outstanding balances not paid within ninety days of the billing date will bear interest at an annual rate of 15% per annum (1.25% per month) until paid in Ml.
It is our understanding that the partnership is a general partnership, that you are partners, and that each of the partners will be responsible for payment of our fees and expenses.... I ask that a partner of BMI Apartments Associates acknowledge the partnership’s acceptance and approval of the fees and scope of work as described. ...
Also, we request that the partnership pay us a retainer of $10,000 against which we will work until it is exhausted or this matter is concluded....
... we expect to be called upon to prepare briefing documents ... and meet with other potentially responsible parties ... to explain the bases for their liability. The best way to explain this point is to prepare and give them a draft complaint....
As agreed, Mays & Valentine undertook to review the environmental problems confronting BMI and to assess the potential environmental liability of BMI, its partners and others who had owned or operated the site before BMI bought it. With the full concurrence, if not at the insistence, of BMI, Mays & Valentine prepared a complaint to use in attempting to convince Commonwealth that it was liable for the environmental contamination and therefore should buy the site from BMI for the price tentatively agreed to by the prospective purchaser whose environmental audit had uncovered the contamination.
Mays & Valentine, through its partner Neil Kessler, also provided advice to BMI respecting tax implications of various workout proposals being discussed between BMI and some of its partners and the creditors who were pressing for payment of defaulted notes secured by the apartment complex. The partners who were thusly engaged sought to eliminate obligations that they had under certain guarantee agreements. They were either lawyers representing themselves or were non-lawyers who were separately represented by other counsel in the work-out negotiations.
Almost immediately after BMI confronted Commonwealth with the demand that Commonwealth buy the apartment complex or face litigation, Commonwealth launched a not unforeseeable, but perhaps not anticipated, preemptive strike by filing a declaratory judgment action under CERCLA. Whatever may be said of the propriety of such a preemptive strike, it necessitated that BMI file a response and develop a general litigation strategy.
BMI, therefore, duly filed its responsive pleadings, sought dismissal of the claims against it and impleaded other previous owners. Upon full consultation with Gordon, Embree and apparently counsel for some of the other BMI partners, Mays & Valentine took an aggressive posture by asserting against Commonwealth novel counterclaims under environmental statutes other than *779 CERCLA and under common law. This made it necessary for Mays & Valentine to research these theories and to respond to briefs seeking dismissal of the claims based on them. Meanwhile, the action was set for trial and discovery proceeded in the usual course. This, of course, led to substantial activity in defending against Commonwealth’s claims, which potentially exposed the partners of BMI to liability beyond their interests in the partnership, and in prosecuting BMI’s counterclaims against Commonwealth and its cross-claims against the im-pleaded parties.
During status conferences with counsel, it became obvious to the court that further environmental study was required before it would be possible to determine the extent of environmental contamination at the site, the cost of cleanup and the respective liability of all of those who were proper parties to the action. It also appeared that the economic toll of litigation was falling disproportionately on those parties who appeared to have the least ability to bear it and the least likelihood of significant liability for whatever cleanup would be required.[3] Accordingly, the court ordered that all but a few pending proceedings be stayed; that a study, the initial cost of which was assumed by Commonwealth, be performed to assess the nature, extent and source of the contamination; and that, after the study had reached a certain stage, settlement negotiations should proceed under the auspices of a Magistrate Judge.
B. The Fee Situation
Mays & Valentine actually began providing service before the engagement letter was executed. In fact, on the day before BMI executed the engagement letter, Mays & Valentine mailed to BMI a statement of legal fees in the amount of $4,262. This amount was charged against the retainer. Mays & Valentine incurred fees of more than $7,000 in January 1993 and, after applying the remainder of the retainer, the law firm submitted a statement in the amount of $2,353.24.
Mays & Valentine performed under the engagement letter, implementing the aggressive litigation strategy undertaken with the knowledge and approval of BMI. Each month BMI received statements which were reviewed by Gordon and Embree.[4] Each statement set forth an explanation of the time devoted to specifically described tasks and the hourly rates of the lawyer who performed the service. BMI began to accumulate an unpaid balance with the second bill and the amount of billed, but unpaid, fees continued to mount over the ensuing months. At the end of November 1993 when Mays & Valentine decided to seek leave to withdraw, the fees and disbursements totalled $226,000 of which BMI had paid $44,000. Currently there is an outstanding balance of approximately $220,000.
Notwithstanding repeated demands, the fees remain unpaid. When efforts to resolve the impasse proved unsuccessful, Mays & Valentine moved for leave to withdraw as BMI’s counsel.
C. The Grounds of BMI’s Opposition
Although not entirely clear, BMI’s principal position seems to be that discussions about the recoverability of legal fees from Commonwealth and BMI’s inability to afford expensive litigation either modified the engagement letter or operated to impose on Mays & Valentine limits respecting the scope of its activities or the amount of its fees which Mays & Valentine chose to ignore. For these reasons, BMI considers that it has not breached its obligations to the law firm. BMI also argues that Mays & Valentine has not shown that withdrawal will not prejudice BMI. This too, says BMI, precludes withdrawal. The evidence which appears to be *780 the basis for these positions is discussed below.
First, BMI asserts that, in the conference call on- January 6, 1993, Ryan represented that BMI’s attorneys fees would be recovered from Commonwealth.[5] This, says BMI, modifies the terms of the engagement letter executed on January 12, 1993.
Second, BMI argues that Mays & Valentine was informed, directly and indirectly, several times that the partnership could not afford fees of the magnitude which have accrued. For example, on January 25, 1993, BMI sent Mays & Valentine a copy of a term sheet which summarized the agreements under which various BMI partners proposed to be relieved of their guarantee obligations under the defaulted notes which evidenced loans to the partnership. The following statement appeared on the term sheet:
“The Contributing Guarantors, at their expense, will retain Mays & Valentine to pursue Commonwealth Gas concerning a clean up of the environmental contamination of the property, with a' cost up to $25,000.”
There is some dispute over the meaning of this statement and whether it refers to legal fees or to the cost of a cleanup. There is, however, no evidence that the statement or the term sheet were intended to modify the engagement letter.[6]
In March, Ryan suggested that BMI hire an environmental consultant, at a cost of about $25,000 to $50,000, so that BMI could control the scope of the environmental study which was expected to be required to sort out liability and apportion the cost of cleanup. BMI declined this suggestion on the ground that 'it could not afford to hire the consultant.
On March 31, 1993, Ryan sent to other lawyers at Mays & Valentine a memo^ndum which included the following comment:
Review the scope of our engagement to determine what we are authorized to do, and from whom we will take our directions? Also, we need to make a demand for payment of our legal fees currently, because there can be no assurance that our legal fees will be paid by the defendants.
BMI interprets the word “defendants” in the last sentence of this memorandum to refer to BMI and then argues that the sentence establishes that Mays & Valentine knew that its fees could not be paid by BMI. Mays & Valentine contends that the word “defendants” refers to Portsmouth Redevelopment and Housing Authority (“PRHA”) and Commonwealth because they were the defendants in the complaint Mays & Valentine had drafted and would be defendants in the counterclaims which were under consideration.
Ryan’s March. 31 memorandum was distributed at a meeting between Ryan and some BMI partners and their representatives on April 1, 1993. According to a memorandum-to-file written by Ryan after the meeting, there was a general discussion of the issues, including his statement that attorneys’ fees in the next 12 to 18 months, through trial, could reach $200,000.[7] Ryan and the BMI partners all agree that Ryan’s statement respecting fees in the range of $200,000 was made at the meeting.
Ryan’s memorandum also noted that he had told the BMI partners that the. law firm’s current bills had to be paid and that these demands were met by the response that thé partnership “doubted that this could be done.” Ryan’s memorandum also reflects, however, that, notwithstanding the protestation, the partnership agreed to pay the outstanding bills and authorized the firm to respond to the suit filed by Commonwealth and PRHA.
*781 John T. Midgett, an attorney with the Norfolk law firm of Crenshaw, Ware & Martin, testified at the hearing on the motion to withdraw that he told Ryan during the April 1 meeting that his 80-year-old client, one of the BMI partners, could not afford the costs being incurred and that she would be “dead before she saw the benefit from any of that.” Ryan’s memorandum does not reflect this comment, but he does not deny that it was made. Also, Embree testified that he told Ryan on April 1 that BMI did not have the ability to pay the fees of Mays & Valentine’s “institutional clients” and that, if the case became “a war of attrition, our group is attrished-out [sic] very early. I was conveying to him we didn’t have the means to mount substantial fees to fight this case.” Neither Embree nor Midgett told Ryan that Mays & Valentine was not authorized to continue under the terms of the engagement letter. Nor were any limits imposed on the law firm’s activities. Thus, notwithstanding these complaints and expressions of concern about the partnership’s ability to afford the litigation, Ryan left the meeting under instructions to defend the claims asserted by Commonwealth and to pursue available counterclaims.
One month later, just before a discovery hearing in May 1993, Ryan asked the partners to be ready to testify that they could not afford to undertake the environmental tests needed, but that testimony was not required. Then, after another hearing in June, Ryan, Embree, Gordon and Charles S. Montagna met for lunch, at which time the principal topic of discussion was the mounting legal fees. Montagna, a lawyer acting for Dr. and Mrs. King, two of the BMI partners, proposed what he referred to as a “stop-loss” arrangement as a device to limit the partners’ exposure to legal fees. BMI did not pursue this suggestion further and Mays & Valentine did not respond to it.
Legal fees were not discussed again until August 1993, when Mays & Valentine proposed eliminating some pending claims to “skinny down” the case in order to decrease the amount of fees expected to be incurred in prosecuting all the counterclaims and cross-claims then pending. There was no response to that proposal.-
By letter dated September 9, 1993, Mays & Valentine informed BMI that a motion to withdraw would be filed unless BMI and its partners agreed: (1) to retire the fees already incurred by making four monthly payments of approximately $48,000; (2) to make timely payment in full of all subsequent bills; and (3) to agree not to oppose Mays & Valentine’s withdrawal if BMI breached this payment plan. Some BMI representatives testified that this was the first time they had heard that the partnership’s attorneys’ fees might not be recovered from Commonwealth and PRHA.
Several letters followed, with each side becoming increasingly antagonistic in outlining its position and in reciting understandings of previous events and discussions. In December 1993, Mays & Valentine moved to withdraw as counsel for BMI.
D. The Position of Dr. and Mrs. King
Dr. and Mrs. Ronald King were partners in BMI. They were represented by Charles S. Montagna in the discussions preceding execution of the engagement letter and in some of the subsequent discussions with Mays & Valentine about the fees. Montagna was the author of several vitriolic letters concerning the fee dispute and he testified at the hearing on the motion to withdraw. He also filed on behalf of Dr. and Mrs. King a brief opposing the motion to withdraw.
Montagna participated in the January 6, 1993, telephone conference which preceded execution of the engagement letter. At the conclusion of that conference, Montagna says that he understood that “100% of the costs and attorneys fees were recoverable in this type of action.” Montagna also explained that he believed that the term sheet limited the attorneys fees for BMI to $50,000, notwithstanding that the only figure respecting the environmental matter mentioned in the term sheet is $25,000 and even it does not purport to circumscribe the amount of attorneys fees.
Montagna explained that during the June lunch meeting with Ryan, he had informed *782 Ryan that Dr. and Mrs. King “could not afford any massive litigation expenses and that he understood such expenses were 100% recoverable in this action.” Montagna says that he raised the stop loss provision and a contingent fee arrangement[8] to try to resolve the budding dispute over legal fees.
On the foregoing basis, Dr. and Mrs. King advance essentially the same arguments as does BMI.
DISCUSSION
Under Local Rule 7(1), the court applies the rules in the Virginia Code of Professional Responsibility as the first step in deciding whether Mays & Valentine may be given leave to withdraw. Mays & Valentine bases its motion on DR 2-108(B)(3), the continued failure of the client to satisfy its obligations to the lawyer, and on DR 2-108(B)(4), undue financial burden on the lawyer. In opposition to the motion, BMI asserts that: (1) it will be prejudiced by withdrawal; and (2) it has not breached its obligations because it understood that the fees were to be recovered from Commonwealth in the litigation and because the fees are beyond what it told Mays & Valentine it could afford.
Disciplinary rules are mandatory in character. Virginia Code of Professional Responsibility, Preamble. They “state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action.” Id. The determinative rule here is DR 2—108(B) which provides:
Except as stated in paragraph (C), a lawyer may withdraw from representing a client if:
(1) Withdrawal can be effected without material prejudice to the client; or
(2) The client persists in a course of conduct involving the lawyer’s services that the lawyer reasonably believes is illegal or unjust; or
(3) The client fails to fulfill an obligation to the lawyer regarding the lawyer’s services and such failure continues after reasonable notice to the client; or
(4)The representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client.
DR 2-108 states disjunctively the four circumstances under which withdrawal is allowed. Like Local Rule 7(G), paragraph (C) of the disciplinary rule requires leave of court as a condition precedent to withdrawal in any pending proceeding and this, in turn, requires the court to consider the administration of justice when deciding whether withdrawal is appropriate. Thus, a lawyer may withdraw upon satisfaction of any one of the four criterion established by DR 2-108, provided that the withdrawal does not interfere with the administration of justice.
The Virginia Code of Professional Responsibility also establishes Ethical Consideration which are separate, but related, parts of the ethical construct established by the code. Ethical Considerations “are aspirational in character and represent the objectives toward which every member of the profession should strive.” Virginia Code of Professional Responsibility, Preamble. These considerations are intended to set guiding principles helpful to the application of the Canons of Ethics and the Disciplinary Rules. Ethical Consideration 2-34 of the Virginia Code of Professional Responsibility states in pertinent part that “[a] lawyer should not withdraw without considering carefully and endeavoring to minimize the ... possibility of prejudice to his client as a result of his withdrawal.”
BMI contends that EC 2-34 precludes withdrawal where it results in prejudice to the client. The argument goes too far. The provisions of EC 2-34 simply require the lawyer to consider prejudice to the client and to attempt to minimize it if withdrawal is permitted under any one of the circumstances specified in DR 2-108 which, as explained above, are stated in the disjunctive. Thus, although EC 2-34 prohibits the lawyer from withdrawing without first considering prejudice to the client, the clearly disjunctive nature of DR 2-108 makes prejudice a factor *783 in the court’s determination of a motion to withdraw under DR 2-108(B) (3) or (4) only insofar as prejudice is implicated in the administration of justice.
These principles provide the general framework for analysis of the grounds on which Mays & Valentine bases its motion to withdraw.
I. Failure to Fulfill an Obligation: DR 2-108(B)(3)
There is no dispute between the parties that BMI has failed to pay all but approximately $44,000 of the fees and expenses billed by Mays & Valentine and that BMI’s refusal to pay is a deliberate action which has continued after reasonable notice. What is at issue is: (1) whether Mays & Valentine told BMI that the fees would be recovered from Commonwealth and PRHA and that the firm would assume the costs of the litigation until then, and, if so, whether the engagement letter must be interpreted in light of such statements; and (2) whether Mays & Valentine was directed to limit its fees or its services, thereby effecting a modification of the engagement letter.
1. BMI’s Obligation to Mays & Valentine.
“[Ajbsent overreaching on the part of an attorney, contracts for legal services are val-, id and, when those services have been.performed as contemplated in the contract, the attorney is entitled to the fee fixed in the contract_” Heinzman v. Fine, Fine, Legum & Fine, 217 Va. 958, 962, 234 S.E.2d 282, 285 (1977) (footnote omitted). “[A] lawyer’s compensation is governed by the express contract with a client and they are bound to its terms.” Petition of Rosenman Colin Freund Lewis & Cohen, 600 F.Supp. 527, 531 (S.D.N.Y.1984) (quoting Williamson v. John D. Quinn Corp., 537 F.Supp. 613, 616 (S.D.N.Y.1982)).
The Supreme Court of Virginia, in observing that the contract between lawyer and client is unlike any other contract, stated: “Seldom does a client stand on an equal footing with an attorney in the bargaining process. Necessarily, the layman must rely upon the knowledge, experience, skill, and good faith of the professional.” Heinzman, 234 S.E.2d at 285. If the lawyer-client contract can ever be said to be the equivalent of a conventional contract, it would be in a situation such as this one, where the client was represented by, or is, an experienced, practicing lawyer. Even where the client is not a lawyer, certain basic principles of contract law are applicable.' Foremost among those principles is the fundamental rule that:
It is the function of the court to construe the contract made by the parties, not to make a contract for them. The question for the court is what did the parties agree to as evidenced by their contract. The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares.
Great Falls Hardware Co. v. South Lakes Village Center Assoc., 238 Va. 123, 125-26, 380 S.E.2d 642, 643-44 (1989) (emphasis omitted) (quoting Wilson v. Holyfield, 227 Va. 184, 187, 313 S.E.2d 396, 398 (1984) (citations omitted)).
The engagement letter plainly states the scope of the representation and the fee arrangement. It also states clearly that BMI and its partners will be liable for payment of the fees. There is no mention in the engagement letter of a limit on fees nor does it provide that the fees will be recovered from the adverse parties. Even assuming that Ryan expressed the opinion that the fees would be recoverable from Commonwealth and PRHA, there is nothing in the contract, or elsewhere, to evidence that Mays & Valentine agreed to assume the costs of representation until a court awarded BMI its attorneys’ fees.
Moreover, BMI has not contended that any provision of the engagement letter is ambiguous. Thus, the plain language of the document controls. Great Falls Hardware, at 125-26, 380 S.E.2d at 643-44. In arguing that it was not obligated to pay the fees when billed, BMI is attempting to modify the engagement letter by having BMI’s obligations measured by its unilateral under *784 standing of verbal comments allegedly made by Ryan before and after the engagement letter was executed. Where, as here, the agreement is unambiguous, there is no basis for consideration of parol evidence. Id. Accordingly, under fundamental rules of contract construction, BMI’s obligations must be measured by the plain language of the engagement letter which provides that all “[b]ills are due and payable when rendered.”
Even if the applicable rules of construction permitted parol evidence, BMI could not prevail for several reasons.
First, the record reflects that the decision which raised the possibility of recovering legal fees from an adversary in a CERCLA ease was not issued until February 2, 1993, four weeks after the January 6 conference call and two weeks after the engagement letter was executed. It is, according to BMI, that decision on which Ryan based his advice about the recoverability of legal fees from Commonwealth and PRHA. Thus, the chronology of events cuts against BMI’s contention that, at the time the engagement was executed, the BMI partners were acting under a belief that legal fees could be recovered as response costs in a CERCLA action.
Second, the record also establishes that Ryan told BMI that the recent decision was on the cutting edge of the law and might not be followed by other judges. Moreover, even under that decision, the recoverability of attorneys’ fees would have required that BMI take the lead in cleaning up the site, an action which BMI told Ryan it was not prepared to undertake. Under those circumstances, it defies logic that Ryan would have represented to the BMI partners in the conference call which preceded the execution of the engagement letter that the partnership’s attorneys’ fees could be recovered from Commonwealth and PRHA.
Third, the facts taken as a whole disprove the assertion that Ryan made such a statement. Gordon, the principal representative of BMI, and his law partner, Embree, are experienced real estate lawyers. Mid-gett and Montagna, who served as individual counsel for Mrs. Berlin and Dr. and Mrs. King, respectively, also are experienced lawyers. Not one of them suggested that the language of the engagement letter—which of course is diametrically opposed to what they contend Ryan said—be changed to reflect the understanding they now urge the court to accept. This confirms that, whatever Ryan may have said about the recoverability of attorneys’ fees from Commonwealth and PRHA, it was not that BMI was not required to pay the statements rendered by Mays & Valentine or that the law firm would absorb the cost of the litigation until such time as a court might award attorneys’ fees. It is incomprehensible that the experienced lawyers—Gordon, Embree, Midgett and Mon-tagna—would have accepted the terms of the engagement letter without ensuring that it reflected their understanding on this significant term. Their failure to do so is convincing evidence that the engagement letter reflected the terms to which BMI agreed.
The arguments advanced by Messrs. Mid-gett and Montagna that they did not see the engagement letter until after it was executed do not change this result. Gordon, the partner who executed the letter, was acting on behalf of the partnership, and the partners are jointly liable for the debts of the partnership. Va. Code Ann. § 50-15(b) (Repl.Vol. 1989). Furthermore, it appears from the record that both Midgett and Montagna received, and presumably read, copies of the engagement letter shortly after it was executed. Their failure to complain, at that time, that the letter did not accurately reflect their understanding of the terms of the engagement is persuasive evidence that the letter did reflect their understanding of its terms.
2. Modification of the Engagement Letter.
Nor does the evidence support the contention that Mays & Valentine agreed to a waiver or a modification of the engagement letter after it was executed. BMI’s first argument is that the term sheet clearly informed Mays & Valentine of a limit on legal fees, thereby modifying the engagement letter. That argument is unpersuasive. The term sheet was given to Mays & Valentine only because the firm had agreed to review *785 the tax implications of the agreements by which the individual partners, upon the advice of their own separate counsel, were to alter their obligations as guarantors of BMI’s indebtedness. As BMI notes in its brief, “Mays & Valentine provided limited assistance to BMI in negotiating with its lenders ... the majority of its services have been required in advising BMI concerning the environmental contamination_” Having acknowledged that these were separate issues, BMI cannot now be heard to contend that the term sheet should have been read by Mays & Valentine as a specific limitation on the fees permitted by the engagement letter.
Moreover, there is no evidence that Mays & Valentine agreed to the statement in the term sheet as a limit on the obligation of BMI or its partners for the fees incurred pursuant to the representation performed under the engagement letter. The absence of such evidence is fatal to BMI’s argument because where, as here, the law firm’s agreement is reflected in a bilateral contract, the unilateral understanding of the client respecting one of the contract terms is insufficient to permit modification of the contract.
Neither do the discussions subsequent to the execution of the engagement letter impose limits on its scope of services or fee provisions. None of the statements made by BMI specifically informed Mays & Valentine that there was a limit on the services the firm was to perform or on the fees to which the firm would be entitled. The statement made by Midgett that Mrs. Berlin would not live to see the benefit of the representation is neither a modification of the engagement letter nor an instruction to limit the services or fees. Nor are complaints made by Midgett, Montagna or Gordon about the amount of the fees or Montagna’s suggestion that the law firm consider a “stop loss” provision sufficient to modify the contract or to impose the limits now being asserted. BMI understood shortly after the execution of the engagement letter, if not before, that it was engaged in a complex environmental matter, in which it opted to pursue an aggressive strategy. It is not tenable now to assert that complaints about the cost of implementing that strategy should be interpreted as limits on the scope of the services required, and the fees incurred, in prosecuting the agreed upon strategy.
Finally, BMI was informed each month in detail about the activities of its counsel and how much those activities were costing. If BMI had desired to curtail the law firm’s services or to place a limit on legal fees, it could have done so by telling Mays & Valentine to cease or limit its activities. BMI admittedly received and read Mays & Valentine’s monthly statements, but gave no such instruction. That is convincing evidence that no limits were imposed on the scope of services or the amount of fees. Nor is there any evidence that Midgett or Mon-tagna ever asked Gordon to limit the activities or the fees of Mays & Valentine.
Indeed, in August, when Mays & Valentine suggested the possibility of eliminating some claims to limit costs, admittedly with the caution that doing so would cause BMI to lose those claims permanently, BMI did not accept or further pursue the suggestion. Of course, it also was within BMI’s power to dismiss Mays & Valentine when BMI realized the fees were going to far exceed what it contends it said it could afford. The partnership’s failure to dismiss the firm, or to specifically require it to limit its activities, significantly undermine the contentions that BMI and some of its partners make now concerning their understandings as to their responsibility for the law firm’s fees.
3. Inability to Pay.
Although at the time it undertook the representation, Mays & Valentine was aware that the partnership and some of the partners were experiencing financial difficulties, the law firm also was aware that the partners were able to make substantial payments to discharge their guarantee obligations after the engagement letter was executed. The term sheets (which BMI contends placed a cap on the fees) also illustrates the ample financial ability of some of the partners. BMI admits that, in April 1993, Ryan estimated that the fees could reach $200,000 and, notwithstanding this knowledge, BMI did not order Mays & Valentine to limit or cease *786 work on its behalf. Current protestations of the inability to pay fees in that approximate amount therefore are not convincing. Taken as a whole, the record does not show that the partnership, and all of its individual partners, could not then afford to pay for the services the engagement letter obligated the law firm to provide to BMI.[9] Furthermore, although the record establishes that BMI’s cash flow is currently restricted and that some of its partners have exhausted their resources, the evidence does not show that none of the partners is unable to pay the outstanding fees.
In any event, the inability of the client to pay the fees is not relevant to the grounds of withdrawal advanced by Mays & Valentine, except to the extent that evidence on that issue bears on whether the engagement letter was modified. For the reasons set forth above, the evidence on BMI’s financial condition does not help BMI’s argument respecting modification.
On this record, the court concludes that the unambiguous terms of the engagement letter obligate BMI and its individual partners to pay the law firm’s statement of fees and expenses as they are submitted. The undisputed record establishes that BMI has failed to fulfill that obligation after reasonable notice.
II. Unreasonable Financial Burden: DR 2-108(B)(4)
Because the grounds of withdrawal in DR 2-108 are stated disjunctively and because the court finds that Mays & Valentine has established the requirements of DR 2-108(B)(3), it is perhaps unnecessary to resolve the contention that continued representation would be an unreasonable financial burden on the law firm within the meaning of DR 2—108(B)(4). Nonetheless, under the factual circumstances surrounding the motion and considering the briefs of the parties, the court considers it appropriate to address this issue.
The record shows that continued representation will serve only to increase the already heavy burden of carrying a debt of almost one-quarter of a million dollars. It is unreasonable to require a law firm, even one the size of Mays & Valentine, which is owed that much money to continue to serve in a case such as this when the client maintains that it can only make payments of at most $2,000 per month and the likely course of the litigation, if it is not settled, will require the law firm to render substantial additional service if it is to fulfill its obligation of zealous representation.
If the pending settlement discussions do not result in a resolution by May 16, 1994, the litigation will resume so that the trial can begin on August 22,1994. In that event, the fees certainly will exceed $2,000 per month, the amount that BMI has suggested as a payment schedule. If curtailed at that level, the existing obligation would not be paid for more than 100 months and future obligations likely never would be paid. On this record, Mays & Valentine has met the requirements of DR 2-108(B)(4).[10]
III. Prejudice and Continued Representation.
BMI argues that the court should deny the motion to withdraw because of the prejudice which would befall the partnership as a result of withdrawal. As explained above, DR 2-108(B) is disjunctive, and having established that BMI has failed to fulfill its obligation to the firm and that the burden of continued representation would be unreasonable, Mays & Valentine may be permitted to withdraw, notwithstanding any prejudice to BMI, unless the court finds that withdrawal would interfere with the administration of justice. The trial is not imminent and the court concludes that withdrawal will not substantially affect the administration of justice.[11] The only prejudice likely to occur if *787 Mays & Valentine is permitted to withdraw is the prejudice which always will exist when withdrawal is based on the.client’s inability, or refusal, to pay a fee: substitute counsel may be difficult to obtain, or the client will be required to proceed pro se. Although BMI asserts that finding replacement counsel without a conflict will be difficult, it offered no evidence that it has tried and failed to secure replacement counsel.
BMI contends that substantial prejudice will occur because several motions are pending. The court has disposed of all but one of the pending- motions, and the remaining motion soon will be decided on the basis of previously filed briefs and argument. Accordingly, this perceived ground of prejudice is no longer of concern.
BMI also argues that it will be prejudiced because a Magistrate Judge has been appointed to supervise settlement negotiations and Mays & Valentine is in the best position to counsel BMI on that subject. While Mays & Valentine may be in the best position, presently, to counsel BMI, this does not constitute an impediment to the administration of justice sufficient to warrant requiring Mays & Valentine to continue representing BMI. Replacement counsel will have sufficient time to review the pleadings and the results of the forthcoming study.
The administration of justice could be adversely affected if BMI did not have the files generated on its behalf by Mays & Valentine and if replacement counsel did not have reasonable access to Mays & Valentine in the transition process. Therefore, it is appropriate to condition withdrawal upon prompt delivery to BMI of the files and research generated on its behalf for use in conducting settlement negotiations and in defending itself and upon the agreement of Mays & Valentine to assist replacement counsel in the transition period.
For the foregoing reasons, the court finds that withdrawal, subject to appropriate conditions, will not adversely affect the administration of justice.
IV. Adjudication Of The Fee Dispute.
BMI contends that the court has jurisdiction to resolve the fee dispute under various decisions holding that a court has inherent power to determine the reasonableness of attorneys’ fees. Those decisions all involve situations where the court has the express power to award attorneys’ fees or otherwise properly has jurisdiction over a dispute involving attorneys’ fees.
Here the dispute, which arises out of the alleged breach by Virginia clients of a contract with a Virginia law firm, is between non-diverse parties, does not involve a federal question, and presents no other basis of federal jurisdiction. Hence, this court has no jurisdiction to decide that dispute.
CONCLUSION
For the foregoing reasons, the court grants Mays & Valentine’s motion to withdraw as counsel to BMI in this action, subject to the conditions that: (1) withdrawal shall not occur until Mays & Valentine files a pleading reciting that all papers, property and research generated to date on behalf of BMI have been delivered to BMI; and (2) after its withdrawal Mays & Valentine shall, at its expense, reasonably cooperate with replacement counsel to facilitate a transition.
The Clerk is directed to send a copy of this Memorandum Opinion and Order to all counsel of record.
It is so ORDERED.

. Currently, without regard to the financial effect of the environmental contamination, the value of the unencumbered property is said to be equal to the approximately $1.3 million debt on the prop-eriy, which reportedly is generating a cash flow of approximately $1,000 a month.

. 42 U.S.C. §§ 9601 et seq. ■

. That observation was made on the basis of a very limited record and does not constitute finding, tentative or otherwise, on liability or financial responsibility. However, courts are obligated to assess such matters preliminarily in performing the administrative and case management functions required by Fed.RXiv.P. 1 and Fed.R.Civ.P. 16.

. Embree testified that he noticed “after the first month or so, we started getting huge bills.” The record does not reflect whether Gordon or Em-bree sent copies of the statements to the other BMI partners.

. See pp. 777-778 supra.

. Indeed, the only apparent reason for sending the term sheet to Mays & Valentine was to permit its partner, Neil Kessler, to review possible tax implications to the partnership. Under the term sheet, some of the BMI partners paid more than $100,000 to resolve their debts.

.Ryan’s memorandum-to-file noted that there was “a significant risk that BMI would not be paid it[s] consultants’ and attorneys' fee as response costs unless it gets some advance approval or declaration from the court.” It is not clear from the memorandum'whether this statement was made at the meeting.

. Montagna did not explain how a contingent fee arrangement might operate when, as here, his client was the defendant in a CERCLA action but, presumably, he anticipated some recovery in the counterclaims to which a contingency would relate.

. In that respect, when Ryan's March 31 memorandum is read in context, the word "defendants" refers to Commonwealth and PRHA, not to BMI and its partners.

. The court also has concerns that relations between the parties have deteriorated to a point where a working relationship may not be possible.

.If BMI’s replacement counsel (or BMI proceeding pro se) can show the need for extra *787 preparation time, that issue can be presented to the court later.